# EXHIBIT 1

Case: 1:26-cv-09161 Document #: 42-P4 Filed: 07/31/26 Page 2 of 66 PageID #:36

FILED
6/30/2026 5:17 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L007750
Calendar, R
38812072

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

KATHLEEN HAMAKER, )
)
Plaintiff, )
)
v. )   Case No.     2026L007750
)
R.J. REYNOLDS TOBACCO COMPANY, )   **JURY DEMANDED**
PHILIP MORRIS USA INC., )
LIGGETT GROUP LLC, and )
WALGREEN CO., )
)
Defendants. )

## COMPLAINT AT LAW

NOW COMES, KATHLEEN HAMAKER, and files this Complaint at Law against the Defendants, R.J. Reynolds Tobacco Company, a foreign corporation, ("R.J. Reynolds"), Philip Morris USA INC., a foreign corporation, ("Philip Morris"), Liggett Group LLC, a foreign limited liability company, ("Liggett"), and Walgreen Co. an Illinois Corporation, ("Walgreens"), and alleges as follows:

### *Parties & Jurisdiction*

1. At all times material Plaintiff KATHLEEN HAMAKER (hereinafter sometimes referred to as "Plaintiff") resided in Kane County, Illinois.

2. Plaintiff smoked cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants, including but not limited to Salem, Virginia Slims and Marlboro cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by Defendants R.J. Reynolds and Philip Morris.

1

FILED DATE: 6/30/2026 5:17 PM    2026L007750

3. Plaintiff began smoking cigarettes in or about 1969. She smoked Salem cigarettes from 1969 until the 1980s, switched to Virginia Slims for a few years and then finally switched to Marlboro until she ultimately quit smoking in 2014.

4. Plaintiff smoked cigarette products that she purchased from Defendant WALGREEN CO.

5. Defendant, R.J. REYNOLDS TOBACCO COMPANY, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution of cigarette products and conspired with other Defendants to fraudulently misrepresent and conceal the dangers of smoking, cigarettes smoked and inhaled by Plaintiff, which caused and/or substantially contributed to the development of Plaintiff's lung cancer which has metastasized to her hip and neck. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

6. Defendant, PHILIP MORRIS USA INC., is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Virginia with its principal place of business in the State of Virginia that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution of cigarette products and

FILED DATE: 6/30/2026 5:17 PM   2026L007750

conspired with other Defendants to fraudulently misrepresent and conceal the dangers of smoking, cigarettes smoked and inhaled by Plaintiff, which caused and/or substantially contributed to the development of Plaintiff's lung cancer which has metastasized to her hip and neck. Service of process over this Defendant may be had through its registered agent, United Agent Group Inc., 1320 Tower Road, Schaumburg, Illinois 60173 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

7. Defendant, LIGGETT GROUP LLC, (f/k/a LIGGETT GROUP, INC., f/k/a BROOKE GROUP, LTD., Inc., f/k/a LIGGETT & MYERS TOBACCO COMPANY), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business located in the State of Delaware that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution of cigarette products and conspired with other Defendants to fraudulently misrepresent and conceal the dangers of smoking, cigarettes smoked and inhaled by Plaintiff, which caused and/or substantially contributed to the development of Plaintiff's lung cancer which has metastasized to her hip and neck. Service of process over this Defendant may be had through this Defendant's registered agent, CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

3

8. Defendant, WALGREEN CO., is a corporation authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Illinois with its principal place of business located in the State of Illinois. Defendant distributed and/or sold cigarettes which Plaintiff purchased, smoked and inhaled which caused and/or substantially contributed to causing the development of her lung cancer which has metastasized to her hip and neck. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

9. Plaintiff, was diagnosed with lung cancer, on or shortly after September 2024, caused by smoking cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants named herein. Sometime thereafter, Plaintiff reasonably became aware that her lung cancer was related to her smoking. Her lung cancer has since metastasized to her hip and neck

10. Plaintiff's action is an action for damages in excess of the sum of FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS.

11. The wrongful conduct herein alleged, occurred, at least in part and/or the damages complained of by Plaintiff were sustained in the county where the above styled Court sits, or the Defendants herein reside in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

12. Plaintiff resides in the State of Illinois and/or one or more of the Defendants against whom this action is brought resides in the county where the above styled Court sits and thus venue of this action properly lies in the Circuit Court of Cook County pursuant to Illinois law.

4

FILED DATE: 6/30/2026 5:17 PM   2026L007750

13. The Plaintiff would further show that Defendants at all times material to this cause of action, through their agents, alter-egos, officers and representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state; committed a tortious act within the state by allowing Plaintiff to be exposed to an unreasonably dangerous product, to-wit: cigarette and/or cigarette smoke. Defendants failed to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Plaintiff, or other persons similarly situated, of the risks, dangers and harm, to-wit: the contracting of the diseases of lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and other diseases and/or injuries to which she was exposed by smoking cigarettes, resulting from the ordinary and foreseeable use of said products, and said tortious conduct is continuing and presently existing; caused injuries and death, which arose out of the acts and/or omissions which occurred inside and outside of the State of Illinois during the relevant period of time, at which time Defendants were engaged in solicitation or service activities within the State of Illinois, resulting in injuries to Plaintiff. Therefore, jurisdiction properly lies in this Court, as to Plaintiff's action, pursuant to Illinois law.

14. The cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by Defendants herein, when used as intended, were more likely than not to induce in foreseeable users, such as Plaintiff, a state of addiction, habituation, habit formation and/or dependence characterized by the user's inability to terminate or restrict his/her chronic use.

15. At all times material to this action, the cigarette manufacturers, including but not limited to Philip Morris USA Inc., R.J. Reynolds Tobacco Company, individually and as successor by merger to Lorillard Tobacco Company, individually and as a successor by merger to Brown & Williamson Tobacco Corporation, individually and as successor by merger to

FILED DATE: 6/30/2026 5:17 PM 2026L007750

The American Tobacco Company, as well as British American Tobacco, Liggett Group LLC, Vector Group LTD., and their predecessors, successors, agents and/or alter-egos (hereinafter referred to as "cigarette manufacturers") knew or should have known the following:

  a.  that smoking cigarettes greatly increased the risk of a smoker developing lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup and other related physical conditions when used as intended;

  b.  that the diseases and/or injuries listed above would be more likely experienced if users such as the Smoker did not restrict their intake of Defendants' cigarettes, or if they began to use such products at an early age;

  c.  that use of the products as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

  d.  that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

  e.  that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

  f.  that cigarette sellers could develop a reasonably safe dose for foreseeable users;

  g.  that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the Smoker;

  h.  that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced; and/or

  i.  that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

6

*Historical Allegations of the Defendants' Unlawful Conduct Giving Rise to the Lawsuit*

16. The Defendants engaged in a conspiracy to misrepresent the harms of smoking cigarettes, secondhand smoke, so-called "filter", "light", and "low tar" cigarettes, and the addictive qualities of nicotine. The co-conspirators include, but are not limited to, R.J. Reynolds Tobacco Company, Philip Morris USA Inc., Liggett Group LLC, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, Committee of Counsel (CC), Ad Hoc Committee, Scientific Advisory Board, Tobacco Industry Research Committee (TIRC), Council for Tobacco Research (CTR), Hill and Knowlton, Special Projects, Tobacco Manufacturers' Association, AMA ERF, Center for Indoor Air Research ("CIAR"), the Associates for Research into the Science of Enjoyment ("ARISE"), and several other law firms, including but not limited to the outside law firms referenced in Robert Proctor's report.

17. Prior to 1900, lung cancer was virtually unknown as a cause of death in the United States. By 1935, there were an estimated 4,000 lung cancer deaths annually, and by 1945 that figure had almost tripled.

18. By the 1920s, scientists were beginning to investigate the relationship between the concomitant rise in cigarette consumption and lung cancer, and to focus on the health consequences of smoking.

19. By the end of the 1940s and early 1950s, far more evidence linking smoking to disease began to appear, ranging from the ground-breaking statistical studies of two eminent British statisticians, Bradford Hill and Sir Richard Doll, to the Graham and Wynder studies at Washington University, to animal research studies pointing to the carcinogenicity of cigarettes.

20. The mainstream media began to pay attention to the growing scientific literature and report on the scientists' findings. For example, in 1953, Reader's Digest, which was at the time one of the most popular publications in the country, published a series of articles titled "Cancer by the Carton" which relayed the scientific findings of Drs. Wynder and Graham. The magazine quoted one of the conclusions they reached in their American Cancer Society study which had been published in the American Medical Association's Journal of May 27, 1950 ("JAMA"), namely that "Excessive and prolonged use of tobacco, especially cigarettes, seems to be an important factor in the induction of bronchiogenic carcinoma." Such mainstream media publicity in popular magazines such as Time, Life, and Reader's Digest triggered understandable public concern.

21. In short, by 1953, there had been a very substantial rise in the annual per capita consumption of cigarettes and the number of deaths attributable to lung cancer; scientists were more and more convinced that a relationship existed between cigarette smoking and lung cancer; and the public was growing increasingly aware of and anxious about both developments.

22. In December 1953, Paul M. Hahn, President of American Tobacco Co., (American), sent telegrams to the presidents of the seven other major tobacco companies and one tobacco growers' organization, inviting them to meet and develop an industry response to counter the negative publicity generated by the studies linking cigarette smoking and lung cancer. The telegrams were sent to: Edward A. Darr, President of Defendants Reynolds; Benjamin F. Few, President of Defendants Liggett; William J. Halley, President of Lorillard Tobacco Co., (Lorillard); Timothy V. Hartnett, President of Brown & Williamson Tobacco Co., (B&W); O. Parker McComas, President of Defendants Philip Morris; Joseph F. Cullman, Jr., President

8

FILED DATE: 6/30/2026 5:17 PM   2026L007750

of Benson & Hedges, J.B. Hutson, President of Tobacco Associates, Inc.; and J. Whitney Peterson, President of United States Tobacco Co.

23. Executives from every tobacco company listed above, except for Liggett, met in New York City at the Plaza Hotel on December 14, 1953. The executives discussed (i) the negative publicity from the recent articles in the media, (ii) responding to the problem by jointly engaging a public relations counsel, and (iii) removing health themes from advertising. They also discussed Liggett's decision not to attend the meeting because "in the course of time the whole thing would blow over." The executives also authorized the five members of the group who had their offices in New York to engage the services of Hill & Knowlton on behalf of the whole committee; to meet with John Hill at the Plaza Hotel the next day, December 15th, to discuss the negative publicity problem; and to request that Hill & Knowlton, if it accepted the assignment, submit recommendations to the full committee at a subsequent meeting as to how to proceed. It is clear from all the surrounding circumstances that representatives of Hill & Knowlton had been contacted about taking on this assignment prior to December 14, 1953.

24. The tobacco company executives did not meet, as they have suggested, in an altruistic response to requests from the scientific community that the industry fund research on smoking and health. Rather, they convened a strategy meeting of the highest company officials to formulate an industry-wide response (a) to the public's growing anxiety generated by the negative publicity about the direction of scientific research on cigarettes and cancer, and (b) to what they accurately understood to be a major threat to their corporations' economic future. While it is true that there was a recommendation "to do good science, independent science,", the minutes of the meeting reveal that:

9

FILED DATE: 6/30/2026 5:17 PM   2026L007750

> "It was recommended that this [research] group undertake to enlist the cooperation of the National Institutes of Health of the U.S. Public Health Service in working out a program of scientific investigation through which the facts in the present controversy would be developed. This was considered highly advisable in that it would give to the program an aspect of independence to the program to a degree not obtainable in any other way."

25. At the December 14, 1953, meeting, Paul Hahn of American and Timothy Hartnett of B&W told the other company presidents that they had taken definite steps to remove the health themes from the advertising programs on Pall Mall and Viceroy. Darr [of Reynolds] made the point that he could not concur in sponsoring an industry paid advertising campaign (if this is the course recommended by the Public Relations Counsel) if the health theme continued to be featured by any one of the companies represented on the committee. J. Whitney Peterson of United States Tobacco and Hartnett "expressed their agreement with Mr. Darr's views in this matter." Hill & Knowlton wanted to develop some understanding with the Defendants that

> "none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. (No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a given brand less likely to cause you-know-what. No "Play-Safe-with-Luckies.)"

26. At the December 15, 1953, meeting, the participants were Paul Hahn of American, O. Parker McComas of Philip Morris, Joseph Cullman, Jr. of Benson & Hedges, J. Whitney Peterson of United States Tobacco, and representatives from Hill & Knowlton, including John Hill and Bert Goss. Hill & Knowlton was told that the industry viewed the "problem [posed by the scientific studies] as being extremely serious and worthy of drastic action." According to a Hill & Knowlton memo dated December 22, 1953, the public relations firm was asked to develop suggestions for dealing with the public relations problem confronting the industry

10

because of widely publicized assertions by a few medical research men regarding the link between cigarette smoking and lung cancer.

27. In an internal planning memorandum, Hill & Knowlton assessed their tobacco clients' problems in the following manner:

> "There is only one problem -- confidence, and how to establish it; public assurance, and how to create it -- in a perhaps long interim when scientific doubts must remain. And, most important, how to free millions of Americans from the guilty fear that is going to arise deep in their biological depths -- regardless of any pooh-poohing logic -- every time they light a cigarette. No resort to mere logic ever cured panic yet, whether on Madison Avenue, Main Street, or in a psychologist's office. And no mere recitation of arguments pro, or ignoring of arguments con, or careful balancing of the two together, is going to deal with such fear now. That, gentlemen, is the nature of the unexampled challenge to this office."

28. Ten days later, on December 24, 1953, Hill & Knowlton submitted a proposal regarding the tobacco industry's public relations campaign, recommending that the companies form a joint industry research committee that would sponsor independent scientific research on the health effects of smoking and announce the formation of the research committee nationwide as news and in advertisements. Hill & Knowlton also recommended that the companies fund objective research by scientists who were independent of the tobacco industry, and that an advisory board be established composed of a group of distinguished scientists from the fields of medicine, research and education "whose integrity is beyond question."

29. In fact, one of the questions posed by Hill & Knowlton to the Defendants was

> "whether the companies considere[d] that their own advertising and competitive practices have been a principal factor in creating a health problem? The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it."

30. Four days later, on December 28, 1953, another meeting was held at the Plaza Hotel and was attended by Paul Hahn of American; Edward Darr of Reynolds; Herbert A. Kent, Chairman

11

FILED DATE: 6/30/2026 5:17 PM   2026L007750

of Lorillard; Timothy Hartnett of B&W; O. Parker McComas of Philip Morris; Joseph Cullman of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; J. Whitney Peterson of United States Tobacco; and three people from the public relations firm of Hill & Knowlton, John Hill, Bert Goss, and Richard Darrow. The attendees agreed on Tobacco Industry Research Committee ("TIRC") as the official name of the research committee; chose Paul Hahn as temporary chairman of the committee; agreed that the search should begin immediately for a qualified director who, together with the companies' research directors, would recommend members for the research advisory board; and reviewed and accepted the Hill & Knowlton proposal regarding the tobacco industry's public relations campaign. The attendees also agreed on a mission statement for the new organization which stated that its "purposes and objectives" were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject.

31.    Hill & Knowlton played a major role in creating, refining, and implementing the strategies adopted by the participants at the December meetings.

32.    Following Hill & Knowlton's advice, the formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers" published in 448 newspapers throughout the United States. All sponsoring cigarette manufacturers and other tobacco industry entities were clearly identified.

33.    The Frank Statement was subscribed to by the following domestic cigarette and tobacco product manufacturers, organizations of leaf tobacco growers, and tobacco warehouse associations that made up TIRC: American by Paul Hahn, President; B&W by Timothy Hartnett, President; Lorillard by Herbert Kent, Chairman; Defendant, Philip Morris by O.

Parker McComas, President; Defendant, Reynolds by Edward A. Darr, President; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc. by W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager; Stephano Brothers, Inc. by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson, President.

34. The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years -- that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence.

> The "Frank Statement" in its entirety stated as follows:
>
> "RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings. Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.
>
> Distinguished authorities point out:

13

1. That medical research of recent years indicates many possible causes of lung cancer. 2. That there is no agreement among the authorities regarding what the cause is. 3. That there is no proof that cigarette smoking is one of the causes. 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of disease is a matter of deep concern to us.

Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer:1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. 3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

35. The issuance of the "Frank Statement to Cigarette Smokers," was an effective public relations step. By promising the public that the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with an effective rationale for continuing to smoke.

36. The Frank Statement was but the first of hundreds, if not thousands, of statements reassuring the public of the safety of cigarette smoking. The industry would push the "open question" as far as the late 1990s.

14

37.    Shortly after the Frank Statement was published, Philip Morris, through a publicized speech, told the public that the industry would "stop business tomorrow" if it thought its products were harming smokers.

38.    TIRC focused its energies and resources in two areas -- public relations and scientific research. First, it served as a sophisticated public relations unit for Defendants, especially in relation to growing public concern about the risks of smoking, by repeatedly attacking scientific studies that demonstrated the harms of cigarette smoke and insisting on the notion of an "open question" regarding cigarette smoking and health. Second, it developed a scientific research program that focused on basic processes of disease rather than evaluating the risks and harms associated with smoking -- the very subject that the industry had pledged to pursue through TIRC. From the outset, the dual functions of TIRC were intertwined, with the scientific program of TIRC always subservient to the goals of public relations.

39.    In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish many advertisements, including one entitled "Some frank words about Smoking and Research," which stated in part:

> "Most scientists recognized long ago that there are no simple, easy answers in cancer research.  They know that the answers to fundamental questions about causation can come about only through persistent scientific research."

> "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public"

> "In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge.  Similar cooperation has been offered to the American Medical Association's proposed study."

> "We know we have a special responsibility to help scientists determine the facts about tobacco use and health.:

15

"The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

40. Defendants' denials of the link between smoking and disease kept away many excellent researchers. In an October 1969 memorandum to Ross R. Millhiser of Philip Morris, Helmut Wakeham, Vice President and Director of Research for Philip Morris, expressed concern that the efforts of the tobacco industry through CTR[1] and the American Medical Association have failed to involve the best investigators. "At the beginning of our support of smoking and health research, this failure may have been connected with our consistent denial of the statistics and our continued assertion that there is nothing to the cigarette causation hypothesis."

41. A year later, Wakeham again discussed CTR's strategy of frequent and public denials, in a December 1970 memorandum to Joseph Cullman, Chairman of Philip Morris and Chairman of the Executive Committee of the Tobacco Institute: "It has been stated that CTR is a program to find out the 'truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes cancer."

42. Virtually none of the research funded by TIRC/CTR centered on immediate questions relating to carcinogenesis and tobacco that could resolve the question of the harms brought about by cigarette smoking. Although some TIRC/CTR-funded researchers explored alternative hypotheses, TIRC/CTR did not typically pursue direct research on cigarettes and disease. Rather than addressing the constituents in tobacco smoke and their demonstrated effect on the

[1] In January of 1964, the TIRC Executive Committee agreed to change the name of the organization to the Council for Tobacco Research-U.S.A. (CTR).

16

FILED DATE: 6/30/2026 5:17 PM   2026L007750

human body, TIRC/CTR directed most of its resources to alternative theories of the origins of cancer centering on genetic factors and environmental risks. The major thrust of TIRC/CTR was to emphasize that human cancers were complex processes, difficult to study and difficult to understand, and to focus on the "need for more research." Although research funded by the Scientific Advisory Board (SAB) was irrelevant to the immediate questions associated with tobacco smoking and health, it did "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.'"

43.  During a four-week visit to the United States in 1958, the three British scientists who met with representatives of TIRC and TIRC's SAB, as well as representatives of American, Liggett, and Philip Morris, reported that "Liggett & Myers stayed out of TIRC originally because they doubted the sincerity of TIRC's motives and believed that the organization was too unwieldy to work efficiently. They remain convinced that their misgivings were justified. In their opinion TIRC has done little if anything constructive, the constantly reiterated 'not proven' statements in the face of mounting contrary evidence has thoroughly discredited TIRC, and the SAB of TIRC is supporting almost without exception projects which are not related directly to smoking and lung cancer."

44.  The Defendants knew that the TIRC/CTR was funding research concerning cancer as a general issue, rather than the relationship of smoking to cancer.

45.  In January 1968, Addison Yeaman, B&W Vice President and General Counsel, wrote: "Review of SAB's current grants indicates that a very sizable number of them are for projects in what might be called 'basic research' without specific orientation to the problem of the relationship of the use of tobacco to human health."

17

FILED DATE: 6/30/2026 5:17 PM   2026L007750

46. In addition, Defendants appreciated the delays associated with the basic research approach. Janet Brown, outside counsel for American, explained CTR's strategy of undertaking only basic research funding, as opposed to funding questions directly related to tobacco and health to Cy Hetsko, Vice President and General Counsel for American, and Addison Yeaman, Vice President and General Counsel for B&W, at a January 1968 meeting. The rationale was that basic research kept alive the Defendants' open question argument on causation. Yeaman summarized Brown's position as: "First, we maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco, and Secondly, that the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco."

47. Following a 1964 Surgeon General's report which discussed the connection between smoking and lung cancer, the industry publicly called for "more research" for the purpose of suggesting that the health question about cigarette smoking was not yet clear, despite the industry's own internal decision not to conduct research directly related to tobacco and health.

48. In 1966 the Tobacco Institute issued a press release where it stated on behalf of the industry:

> "Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. The tobacco industry is supporting much of this research and will continue to do so."

49. Defendants continued throughout the 1970s, 1980s, and 1990s to encourage the impression that there was a genuine and continuing controversy regarding the health hazards of smoking.

18

FILED DATE: 6/30/2026 5:17 PM   2026L007750

50. The tobacco industry frequently attacked the Surgeon General. For example, the industry preempted the Surgeon General's 1979 report on national news networks, stating the report was "suspect from the start". The industry later attacked the Surgeon General following the 1988 report on the addictive nature of cigarettes with a press release titled, "CLAIMS THAT CIGARETTES ARE ADDICTIVE CONTRADICT COMMON SENSE".

51. Later in 1994, after the industry executives testified before congress that cigarettes were not addictive and had not been proven to cause cancer, Philip Morris continued to adhere to the controversy by stating "Both smokers and non-smokers deserve to know the facts, not innuendo, about cigarettes.

> Yesterday, Philip Morris and other U.S. tobacco manufacturers helped to set the record straight by speaking before a Congressional committee…
> Fact: Philip Morris does not add nicotine to its cigarettes…
> Fact: Philip Morris does not "manipulate" nicotine levels…
> Fact: Philip Morris does not believe cigarette smoking is addictive…
> Fact: None of the ingredients added in the manufacture of cigarettes is harmful as used…

52. From 1953 through 2009 and continuing through today, Defendants made false or misleading statements including but not limited to the following:

- denying that smoking "is" addictive;

- that smoking is not injurious to health;

- that it is unknown if smoking causes serious diseases;

- that scientific and medical community has not reached a consensus about the harms of smoking;

- that no one knows what causes cancer;

- that the tobacco industry made an honest effort to study the harms of smoking and a causal relationship had not been proven;

- that filter, low tar and low nicotine, lights and ultra-light are safe, safer and/or directly and/or indirectly made statements about their safety and efficacy.

19

53. Throughout the same period, Defendants publicly attacked the validity of research suggesting any harmful effects from smoking.

54. The purpose of this campaign was to create an impression in the public's mind—including smokers like Plaintiff—that the health issue remained undecided and smoking was not addictive or injurious to health.

### COUNT I: NEGLIGENCE (Manufacturers)

This count applies only to Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC.

55. The allegations contained in paragraphs 1 through 54 are reincorporated and realleged as if fully set forth herein.

56. Plaintiff smoked Salem, Virginia Slims  and Marlboro brand cigarette products that were designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants, which Plaintiff used and smoked in her daily life.

57. Plaintiff was exposed to Defendants' products as a smoker and/or bystander.  Each exposure to such cigarette products of Defendants caused Plaintiff to inhale smoke from said products which caused Plaintiff to develop lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Each exposure to such products was harmful and caused or contributed substantially to Plaintiff's injuries. Plaintiff's injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendants of their cigarette products.

58. Plaintiff was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants.

59. The damages of Plaintiff are the direct and proximate result of the negligence of the Defendants, in that they produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendants knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to Plaintiff's health and well-being. The Defendants, prior to selling and/or distributing their cigarette products, to which Plaintiff was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, bladder cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. The Defendants also knew that Plaintiff and others similarly situated would use and be exposed to its cigarette products in such a way as to cause Plaintiff to inhale the smoke from said products.

60. Defendants' cigarette products, including Salem, Virginia Slims and Marlboro cigarettes, contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Plaintiff was exposed to them in that said products contained tar, nicotine and other harmful substances which the Defendants knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, bladder cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death, to those, such as Plaintiff who used and/or was exposed to them.

61. Defendants knew that their cigarette products would be used by and around Plaintiff without inspection for defects and that any such inspection would not have advised Plaintiff of the fact that the Defendants' cigarette products could cause the injuries which she suffered. Such facts made Defendants' cigarette products inherently and unreasonably dangerous in that Plaintiff was not apprised of, could not and would not contemplate the danger and/or the extent of the

21

danger of contracting the injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendants' cigarette products which she used or was exposed to.

62. Plaintiff alleges that there were methods of design and manufacture available and/or known to the Defendant and unknown to her which could have been used by the Defendants in the design and manufacture of their cigarette products to which Plaintiff was exposed to make such products less dangerous. Defendants were in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Plaintiff and others similarly situated would encounter its cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of serious and life-threatening injuries including, but not limited to, lung cancer. Defendants were negligent in all the following respects, same being the proximate cause of Plaintiff's injuries, disabilities, which acts of negligence have continued to the present time:

   a. in designing and developing cigarette products that were more mild, had better taste and contained nicotine so that foreseeable users, such as Plaintiff, would find smoking Defendants' products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

   b. in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products the Defendants designed, manufactured, advertised, marketed, distributed and/or sold;

   c. in continuing to manufacture, distribute and sell cigarette products when the Defendants knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Plaintiff, when used as intended;

   d. in concealing information while affirmatively misrepresenting to Plaintiff and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or

22

sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Plaintiff to unknowingly use and/or continue to use Defendants' cigarette products herself and expose herself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

e. in failing to test and/or adequately test Defendants' cigarette products before offering them for sale and use by Plaintiff, and other persons similarly situated;

f. in failing to remove and recall all said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and serious;

g. in manipulating, failing to reduce and/or eliminating nicotine from the Defendants' cigarette products to prevent Plaintiff, who was addicted to the nicotine in Defendants' cigarette products, from quitting and/or reducing consumption;

h. in including nicotine, or artificially high levels of nicotine, in Defendants' cigarette products to prevent Plaintiff and other persons similarly situated from quitting and/or reducing consumption;

i. in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

j. by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous; and/or

k. by placing additives and ingredients in cigarettes to make them easier to inhale and addictive.

63. The Defendants' cigarette products to which Plaintiff was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendant.

64. The Defendants' cigarette products failed to perform as safely as Plaintiff expected it would in that they caused her to develop lung cancer which metastasized because of her inhalation of cigarette smoke from Defendants' cigarette products.

65. Each of the Defendants' cigarette products suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars and

23

other substances which Defendants knew or should have known was extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

66. As a direct and proximate result of Defendants' negligent acts and/or omissions, Plaintiff developed injuries, including but not limited to lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff prays for judgment against the Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus pre-judgment and post-judgment interest and costs of suit.

## COUNT II: WILLFUL AND WANTON CONDUCT (Manufacturers)

This count applies only to Defendants R.J. REYNOLDS TOBACCO CO and PHILIP MORRIS USA INC.

67. The allegations contained in paragraphs 1 through 66 are reincorporated and realleged as if fully set forth herein.

68. Plaintiff smoked cigarette products, including but not limited to the Salem, Virginia Slims and Marlboro brand which were designed, manufactured, advertised, marketed, distributed and/or sold by Defendants, which Plaintiff used and smoked in her daily life.

69. Plaintiff was exposed to Defendants' products as a smoker and/or bystander. Each exposure to such cigarette products of Defendants caused Plaintiff to inhale smoke from said products which caused Plaintiff to develop nicotine dependence, lung cancer in addition to other related physical conditions, which resulted in and directly caused her to suffer severe bodily injuries. Each exposure to such products was harmful and caused or contributed substantially to

24

Plaintiff's injuries. Plaintiff's injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendants of their cigarette products.

70. Plaintiff was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by Defendants.

71. The damages of Plaintiff are the direct and proximate result of the willful, wanton and reckless conduct of the Defendants, in that they produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendants knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to the Plaintiff's health and well-being. The Defendants, prior to selling and/or distributing their cigarette products, to which Plaintiff was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, bladder cancer, COPD, Emphysema, asthma, heart disease, other forms of cancer, and/or result in death. The Defendants also knew that Plaintiff and others similarly situated would use and be exposed to its cigarette products in such a way as to cause Plaintiff to inhale the smoke from said products.

72. Defendants' cigarette products, including but not limited to the Salem, Virginia Slims and Marlboro cigarette brands contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Plaintiff was exposed to them in that said products contained tar, nicotine and other harmful substances which Defendants knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, other forms of cancer, and/or result in death, to those, such as Plaintiff who used and/or was exposed to them.

25

73. Defendants knew that their cigarette products would be used by and around Plaintiff without inspection for defects and that any such inspection would not have advised Plaintiff of the fact that the Defendants' cigarette products could cause the injuries which she suffered. Such facts made Defendants' cigarette products inherently and unreasonably dangerous in that Plaintiff was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendants' cigarette products which she used or was exposed to.

74. Plaintiff alleges that there were methods of design and manufacture available and/or known to Defendants and unknown to her which could have been used by Defendants in the design and manufacture of their cigarette products to which Plaintiff was exposed to make such products less dangerous. Defendants were in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Plaintiff and others similarly situated would encounter their cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of serious and life-threatening injuries including, but not limited to, lung cancer. Defendants acted willfully, wantonly, recklessly and consciously disregarded the health and life of consumers including the Plaintiff herein in all the following respects, same being the proximate cause of Plaintiff's injuries and disabilities, which acts have continued to the present time:

    a. Intentionally designing a cigarette product with the knowledge that when inhaled into the lungs it kills more than half of its customers.

    b. Intentionally designing a cigarette product with the knowledge that it kills almost five hundred thousand Americans a year.

    c. Intentionally designing a cigarette product with the knowledge that it is as addictive as heroin and cocaine.

26

d.  Intentionally designing a cigarette product with additives in an effort to make their cigarettes easier to inhale and thus more addictive.

e.  Intentionally designing a cigarette product with the knowledge that one out of every three customers became daily addicted users.

f.  Knowingly designing their cigarette products with filters, and marketing said filter cigarettes, while knowing that filters did not in fact filter out tar or nicotine in the cigarettes and do not reduce any risk of disease or death.

g.  Knowingly designing their cigarettes as lights or ultra lights, and marketing said light and ultra-light cigarettes, while knowing that those designs did not have less tar or nicotine in the cigarettes and do not reduce any risk of disease or death.

h.  Choosing not to use safer alternative designs because they would be less addictive and therefore less profitable; such as reducing the nicotine in the rod by 95% to make cigarettes non-addictive, raising the pH levels in cigarettes to make them non-inhalable, using heat not burn technology to reduce carcinogens by up to 99%.

i.  Knowingly studying teenagers smoking patterns in an effort to induce and addict teenagers to their cigarettes.

j.  Marketing their cigarettes though they knew of the harms and addictive nature, while knowingly concealing their knowledge and misrepresenting the harms and addictive nature to the public.

75.  Defendants at all times herein knew that their cigarette products were dangerous and deadly as set forth above. Despite this, and with utter indifference and/or conscious disregard for the safety of others, including Plaintiff, Defendants designed their cigarette products to maintain the same level of danger, when it could have reduced the harm to their consumers.

76.  As a direct and proximate result of Defendants' willful, wanton, reckless acts and/or omissions and conscious disregard for the health and life of its consumers, including Plaintiff, causing her to develop several life-threatening diseases, including but not limited to metastatic lung cancer in addition to nicotine dependence and other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

27

**WHEREFORE**, Plaintiff prays for judgment against Defendants R.J. REYNOLDS CO. and PHILIP MORRIS USA INC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), together with punitive and exemplary damages, plus pre-judgment and post-judgment interest and costs of suit.

### COUNT III: STRICT LIABILITY (Manufacturers)

This count applies only to Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC.

77.    The allegations contained in paragraphs 1 through 54 are reincorporated and realleged as if fully set forth herein.

78.    Defendants were and have been the designers, manufacturers, advertisers, distributors and/or sellers of cigarette products, including but not limited to Salem, Virginia Slims and Marlboro cigarettes.

79.    The products complained of were cigarette products designed, manufactured, advertised, distributed and/or sold by Defendants and used by and/or in the vicinity of the Plaintiff.

80.    The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by the Defendants.

81.    Plaintiff was exposed to Defendants' cigarette products over many years during which time smoke from Defendants' cigarette products were inhaled by Plaintiff which caused her to develop lung cancer and/or other injuries.

82.    At the time Defendants designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to, and did, reach Plaintiff in a

28

condition without substantial change from that in which such products were when within the possession of Defendant.

83. The Defendants' cigarette products were in a condition unreasonably dangerous to users and/or bystanders, such as Plaintiff and said products were expected to, and did, reach Plaintiff without substantial change affecting that condition.

84. The Defendants' cigarette products were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Plaintiff, and said products were expected to, and did, reach Plaintiff without substantial change affecting that condition.

85. The Defendants' cigarette products were unreasonably dangerous because of their design in that the risk of danger to users and/or bystanders, such as Plaintiff, outweighed the benefits.

86. The Defendants' cigarette products were dangerous beyond the expectation of the ordinary user/consumer/bystander when used as intended or in a manner reasonably foreseeable by Defendant.

87. The Defendants' cigarette products were unreasonably dangerous because a less dangerous design and/or modification was economically and scientifically feasible.

88. Defendants' cigarette products were in a defective condition, unreasonably dangerous, in that those products:

   a. by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to Plaintiff;

   b. contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substances or containing less of them;

   c. failed to filter the harmful substances so that during ordinary use, such materials would not be liberated into the air and/or breathed by the smoker such as Plaintiff;

FILED DATE: 6/30/2026 5:17 PM   2026L007750

d.  through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

e.  utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

f.  the nature and degree of the danger of Defendants' cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

g.  by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous; and/or

h.  by placing additives and ingredients in cigarettes to make them easier to inhale and addictive.

89.  Plaintiff, unaware of the defective and unreasonably dangerous condition of the Defendants' cigarette products, and at a time when such products were being used for the purposes for which they were intended, was exposed to and breathed smoke from Defendants' cigarette products.

90.  Defendants knew that their cigarette products would be used without inspection for defects, and by placing them on the market, represented that they would be safe.

91.  Plaintiff was unaware of the hazards and defects in the cigarette products of the Defendants, to-wit: That exposure to said products would cause Plaintiff to develop cigarette related disease(s) which made said products unsafe for use.

92.  Plaintiff was caused to contract metastatic lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

30

93. As a direct and proximate result of the strict liability of the Defendants, Plaintiff developed injuries, including but not limited to metastatic lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff prays for judgment against Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus pre-judgment and post-judgment interest and costs of suit.

## COUNT IV: FRAUDULENT CONCEALMENT (Manufacturers)

This count applies only to Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC.

94. The allegations contained in paragraphs 1 through 54 are reincorporated and realleged as if fully set forth herein.

95. Beginning at an exact time unknown to Plaintiff and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Plaintiff, physicians, the government and others as to the true dangers of smoking cigarettes. Defendants and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning:

a. the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendants' cigarettes did in fact contain carcinogenic materials;

b. their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;

c. the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

31

d.  the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

e.  the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

f.  the risks of contracting cancer, including but not limited to lung cancer, laryngeal cancer, esophageal cancer, other head and neck cancers, tongue/oral cavity cancer, bladder cancer and other forms of cancer, from smoking cigarettes;

g.  the dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

h.  that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease;

i.  that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

j.  the use of ammonia technology and/or certain tobacco blends to boost the pH of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k.  the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l.  the lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m.  that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n.  that cigarette smoking permanently alters certain receptor sites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

32

o. that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of Defendants' cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p. that smoke from Defendants' cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments including but not limited to lung cancer, bronchitis and pneumonia;

q. that the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters and/or tumor initiators including but not limited to those such as PAHs and nitrosamines found within cigarette smoke.

r. that switching to filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

s. by continuing even today to fraudulently market and sell multiple brands as "filtered" causing smokers to wrongly believe that filtered cigarettes reduce the harms of smoking based on the implication of filtration of smoke and therefore relative safety compared to unfiltered cigarettes However, Defendants and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes; and/or

t. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

96. The cigarette manufacturers, including Defendants herein, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed

33

FILED DATE: 6/30/2026 5:17 PM    2026L007750

in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by the Defendants and have withheld and/or failed to release over the last almost 65 years both because she does not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

97.     The cigarette manufacturers, including Defendants herein, carried out their campaign of concealment by concealing and suppressing facts, information and knowledge about the health dangers of smoking, including addiction. They concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of the nicotine content of their products to create and perpetuate smokers' addiction to cigarettes. The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

98.     In 1953 Dr. Ernst Wynder had published an article titled Experimental Production of Carcinoma with Cigarette Tar in the journal Cancer Research. In his experiments he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954 LIGGETT & MYERS, assuming that whatever cigarettes were used in Dr. Wynder's study

were not CHESTERFIELD or L & M, decided to repeat Dr. Wynder's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for LIGGETT & MYERS, Mr. Darkis writes:

> "If Chesterfield turn out to be negative, and X (used by Wynder) as positive, it would then be possible to say, that by using Dr. Wynder's techniques, Chesterfield did not produce cancer in mice."

Of course, when the experiments were finished in 1955 the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

99. A confidential "limited" LIGGETT & MYERS document dated March 15, 1961 states, in part: (L&M - A Perspective Review)

   a. There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...
   b. What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what good is this? We've known this for several years - so what?

This document was written by an industry consultant for LIGGETT & MYERS. This industry consultant conducted animal research from 1954-1984 for LIGGETT & MYERS. This memo contained material facts known to and concealed by the Defendants since at least 1961 and unknown to Plaintiff.

100. In 1964, TIRC changed its name to CTR, and was joined by Defendant, LIGGETT & MYERS. Defendants, R.J. REYNOLDS TOBACCO COMPANY, and PHILIP MORRIS USA INC. were founding members of the TIRC/CTR. The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

35

FILED DATE: 6/30/2026 5:17 PM  2026L007750

101.  Despite their "promise" which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

102.  Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was withheld from Plaintiff and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

103.  In a July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation.""

36

FILED DATE: 6/30/2026 5:17 PM   2026L007750

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed, industry insiders knew it was nothing more than a "public relations" sham.

104. In that same July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "Moreover, nicotine is addictive. We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:
>
> 1)They cause, or predispose to, lung cancer.
>
> 2)They contribute to certain cardiovascular disorders.
>
> 3)They may well be truly causative in emphysema, etc, etc."

The 1964 Surgeon General's Report was not issued for another 6 months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive, but the cigarette industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite what the industry told the public the industry clearly understood that nicotine was addictive, and cigarettes were a cause of lung cancer and other diseases.

105. The cigarette manufacturers, including Defendants herein, knew for decades that the "tar and nicotine levels", as measured by the so-called Cambridge Filter Method or FTC method, were inaccurate – and seriously underestimated the levels of poisons delivered into the lungs. Yet they continued to tout the tar and nicotine numbers on cigarette packs and marketing materials, inducing smokers to believe lower tar and lower nicotine cigarettes were safer, until 2008 when the Federal Trade Commission ultimately rescinded its guidance concerning tar and nicotine yields.

106. The cigarette manufacturers, including Defendants herein, continue even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking and despite knowing internally that such cigarettes are just as addictive, dangerous, and deadly as non-filtered cigarettes.

107. The aforementioned information and/or knowledge, including that nicotine was addictive and that the tobacco used in cigarettes did cause cancer, was concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and its co-conspirators was material information which Defendants were under a duty to disclose and/or which it had assumed the duty of disclosing through their repeated public statements concerning tobacco and health, the need for more research, and the open question about disease causation. Rather, the Defendants individually and along with its co-conspirators undertook a campaign of misinformation to fraudulently and inaccurately create the impression that they were in favor of the public's health and that the issue of nicotine addictiveness and the carcinogenic nature of tobacco was unsettled when they were in fact already understood by the Defendants to be true.

108. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Plaintiff to smoke, fail to quit or reduce consumption for the Defendant's own pecuniary gain.

109. Defendants concealed the information known to them, while at the same time making affirmative statements denying the link between cigarette smoking and disease. Making affirmative statements denying that cigarettes cause disease while simultaneously concealing

38

the truth about their cigarette products created a duty in the Defendants to disclose the complete truth about their cigarette products.

110.   Plaintiff and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendants herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after the industry chose to repeatedly and publicly deny the harms of smoking, the addictive nature of cigarettes/nicotine and the carcinogenic effects of tobacco.

111.   The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and its co-conspirators was concealed for the purposes of inducing Plaintiff to smoke, fail to quit or reduce consumption. Plaintiff was unaware of the extent of danger of the Defendants' cigarette products, the addictive nature of the Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as unfiltered cigarettes. The knowledge and information concealed by the cigarette manufacturers, including the Defendants named herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Plaintiff.

112.   Indeed, Plaintiff was not aware of any dangers of smoking cigarettes when she first began to smoke in or about 1969.  Had the Defendants not for many years concealed and/or suppressed its knowledge of the dangers of their cigarette products (or spread false information designed to cause confusion) from Plaintiff and the public, including that the products caused cancer and other serious health issues, Plaintiff would not have started smoking, and her risk of injury from cigarettes, including metastatic lung cancer, would have been eliminated.

113.   Plaintiff was also not aware that cigarettes were as addictive as they are.  Had the Defendants not concealed and/or suppressed their knowledge of the addictiveness of its cigarette products

39

from Plaintiff and the public, Plaintiff would not have started smoking or would have stopped smoking at an earlier age or significantly reduced her cigarette intake, and her risk of injury from cigarettes, including lung cancer, would have been reduced or eliminated.

114. Had the Defendants not concealed and/or suppressed its knowledge of the dangers of their cigarette products from Plaintiff and the public, including the dangers of light and filtered cigarettes, Plaintiff would have stopped smoking entirely or significantly reduced her cigarette intake, and her risk of injury from cigarettes, including lung cancer would have been reduced or eliminated.

115. The knowledge and information concealed by the cigarette manufacturers, including the Defendants named herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Plaintiff.

116. Plaintiff did not have access to the Defendants' research, information and/or knowledge about the true dangers of the cigarette products that was concealed, hidden and/or suppressed by Defendants and their co-conspirators, did not have the resources or ability to perform such research or otherwise learn this information, and could not have discovered through reasonable diligence the information about the true dangers of cigarettes that was known and concealed and/or suppressed by Defendants.

117. As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including Defendants herein and their co-conspirators, Plaintiff, smoked and/or continued to smoke and was otherwise exposed to Defendants' cigarette products which caused her to develop injuries, including but not limited to metastatic lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

40

**WHEREFORE**, Plaintiff prays for judgment against Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus pre-judgment and post-judgment interest and costs of suit.

## COUNT V: CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT
### (All Manufacturers)

This count applies only to Defendants R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP LLC.

118. The allegations in paragraphs 94 through 117 are reincorporated and realleged as if fully contained herein.

119. The Defendants, along other tobacco manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by the Defendants unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

120. The Defendants R.J. REYNOLDS, PHILIP MORRIS USA, and later LIGGETT GROUP LLC, along with other entities including the TIRC/CTR, TI and persons including their in-house lawyers and outside retained counsel entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

121. The Defendants, through their employees, agents and representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

41

122. During its four decade history, the TIRC/CTR never acknowledged that smoking had been proven to be a cause of multiple cancer types or other serious diseases in smokers, the addictive nature of nicotine, and the fact that light cigarettes are no safer than regular cigarettes, even though the vast majority of CTR funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often fatal, injuries including multiple cancers, understood the addictive nature of nicotine and also knew that light cigarettes were no safer than regular cigarettes.

123. After the year 2000, the Defendants continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking including but not limited to the following acts:

   a. Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

   b. Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

   c. Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

   d. Continuing to market and/or advertise lights, ultra-lights, and low tar cigarettes under color brand name descriptors such as "Gold" and "Silver" and informing smokers "pack will be changing, but your cigarette will stay the same" following the federal ban on the use of "lights," "mild" and "low" tar descriptors in 2010; and/or

   e. Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

124. The Defendants as it relates to their acts in furtherance of their conspiracy as alleged in this complaint continues through the present.

125. The concealed and omitted information described in the aforementioned and preceding paragraphs was material information.

126. Plaintiff relied both directly and indirectly to her detriment upon the Defendants' concealment and omission of such material information. Plaintiff, during the course of her smoking history,

heard some or all these false and misleading statements and/or similar statements made directly or indirectly by the Defendants, believed some or all of the Defendants and their co-conspirators' false and misleading statements, and relied to her detriment by smoking and continuing to smoke based on such false and misleading statements.

127. Had Defendants and their co-conspirators not concealed and omitted the aforementioned information from Plaintiff and the public, Plaintiff would have not started smoking and/or reduced the number of cigarettes and/or stopped smoking at an earlier age, and her risk of injury from cigarettes would have been reduced or eliminated.

128. Each Defendants' acts and omissions, and those of TIRC/CTR, TI and other tobacco manufacturers, as well as their in-house and retained counsel, and all of them, constitute a successful conspiracy to commit fraud.

129. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as members of a civil conspiracy are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

130. As a direct and proximate result of the fraudulent concealment of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendants and their co-conspirators, Plaintiff smoked and continued to smoke

43

FILED DATE: 6/30/2026 5:17 PM   2026L007750

and/or was otherwise exposed to Defendants' cigarette products which caused injuries, including but not limited to metastatic lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff prays for judgment against Defendants R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP LLC in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus pre-judgment and post-judgment interest and costs of suit.

## COUNT VI: FRAUDULENT MISREPRESENTATION (Manufacturers)

This count applies only to Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC.

131. The allegations contained in paragraphs 1 through 54 are reincorporated and realleged as if fully set forth herein.

132. Beginning at an exact time unknown to Plaintiff, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Plaintiff, the government and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements and/or misrepresentations of material facts in interviews, testimony and print, radio and television advertising.

133. The cigarette manufacturers, including Defendants herein, made literally hundreds of misrepresentations to Plaintiff and others similarly situated over the course of the last 50 years. Plaintiff is unable to allege in full the thousands of pre-1969 advertisements, and the continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and

44

their co-conspirators, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, the TOBACCO INSTITUTE, INC. ("TI") formed in 1958, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because she does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

134. The cigarette manufacturers, including Defendants herein, carried out their campaign of fraud, false statements and/or misrepresentations in at least five ways:

   a. they agreed falsely to represent to Plaintiff and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

   b. they misrepresented and confused the facts about the health dangers of smoking, including addiction. The cigarette manufacturers claimed, falsely, that there is insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

   c. the cigarette manufacturers, including Defendants herein, used lawyers to misdirect what purported to be objective scientific research, yet maintained to Plaintiff and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

   d. to discourage meritorious litigation by Plaintiff injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence to protect the cigarette manufacturers, including Defendants herein, existence and profits;

   e. by designing, selling and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers. Defendants knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker. Notwithstanding same, the Defendants marketed its "Light" cigarettes to consumers as a safer alternative. Defendants manipulated the

45

FILED DATE: 6/30/2026 5:17 PM   2026L007750

design of cigarettes to produce test results that were artificially low.  Furthermore, Defendants knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes;

f.   by continuing to fraudulently market and sell "mild", "low tar", and "light" cigarettes through 2010 despite knowing they were no safer than full flavor cigarettes and knowing consumers perceived them as safer.  The cigarette manufacturers, including Defendants herein, were ultimately prohibited by Congress from marketing "mild", "low tar", and "light" cigarettes when Congress passed the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (June 22, 2009), which became effective on June 22, 2010. Despite the congressional ban, the cigarette manufacturers, including Defendants herein, have continued to market and sell even today the same "mild", "low tar", and "light" cigarettes, only now these cigarettes are marketed with a new coloring scheme instead of the banned light descriptors.  These cigarettes are the same or substantially the same cigarettes as the pre-prohibition cigarettes.  Consumers often perceive the color descriptors on packaging as suggesting less harmful to smoke than regular or full flavor brands.  The cigarette manufacturers, including Defendants herein, is thus able to continue fraudulently misrepresenting the "light", "low tar" and "mild" cigarette marketing the ban was designed to prevent; and/or

g.   by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking. The word "filter" implies filtration of the smoke and therefore relative safety.  However, Defendant and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes.

135.   Cigarette manufacturers, including the Defendants knew that cigarettes were dangerous and addictive. It became the practice, purpose and goal of the cigarette manufacturers to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals and through testimony before governmental bodies.

136.   Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or

46

creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

137.    Despite Defendant's and the industry's promises "to help scientists determine the facts about tobacco use and health" and claiming to support research concerning tobacco and health, Defendants and the industry did not conduct the research they represented that they would conduct.

138.    Instead of conducting the research it promised to do, Defendants focused their efforts on attacking health-related research that showed the dangers of smoking to keep alive a public controversy over whether tobacco smoke was harmful.

139.    The industry paid for advertisements in major newspapers to attack legitimate research. For example, in 1969 the American Tobacco Company, a predecessor by merger to R.J. Reynolds Tobacco Company, stated in the New York Times, "[w]e believe the anticigarette theory is a bum rap."

140.    Defendants continued to avoid studying the health effects of smoking while at the same time continuing to publicly insist on the need for more research.

141.    The industry's purpose was to give smokers what one industry executive called a "crutch" that would justify their continued smoking.

47

FILED DATE: 6/30/2026 5:17 PM   2026L007750

142. Instead of focusing their efforts on health issues as it represented it would do, Defendants focused on research into modifying their cigarettes to increase their addictiveness.

143. Rather than making its research public as they had represented it would do, Defendants publicly denied and suppressed the results of their research.

144. Defendants continued to engage in a course of conduct where they represented to the public many times throughout the years that they would conduct research and disclose results to the public, while at the same time either hiding any potentially damning results or not conducting bona fide research at all.

145. Throughout the years, Defendants have continued to state that cigarettes were not dangerous, and they would either remove harmful constituents or stop making cigarettes altogether.  Some examples include:

> A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, authenticated information about cigarette smoking and health."

> In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we don't accept that."

> In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

> Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

> In a 1978 magazine interview William Dwyer, vice president of the Tobacco Institute, stated: "we take the view that the best science can say is that cigarette smoking may be hazardous. And then it may not be."

FILED DATE: 6/30/2026 5:17 PM   2026L007750

A 1978 Philip Morris publication entitled "Facts About the Smoking Controversy" stated: "scientists have not determined what causes cancer…cigarettes have never been proven unsafe."

In 1984, Ed Horrigan, Chairman of R.J. Reynolds spoke on Nightline and told the public, "It is not known whether cigarettes cause cancer. It has not been causally established."

In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health…Science is science. Proof is proof. That is why the controversy over smoking and health remains an open one."

In 1988, in response to the United States Surgeon General's report that cigarettes are addictive, and nicotine is the drug in tobacco that causes addictions, issuing a press release knowingly and disingenuously stating "Claims that cigarettes are addictive is irresponsible and scare tactics."

In 1994, CEOs from the seven largest cigarette companies, including Defendants herein, knowingly providing false and misleading testimony under oath before the United States Congress that it had not been proven that cigarettes were addictive, caused disease, or caused one single person to die.

146. Defendants continued to make these and similar statements well into the 1990s with the goal of convincing smokers to keep smoking, not reducing their smoking, and/or not quitting.

147. Defendants and the tobacco industry promoted their message through many press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. Defendants and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

148. Industry spokespersons appeared on news shows, on commercials and public television to state that the evidence concerning the health effects of tobacco was based primarily on

49

FILED DATE: 6/30/2026 5:17 PM   2026L007750

statistical relationships and that there was no proof that a specific tobacco component caused a specific disease, and that cigarette smoking was not addictive.

149.    Cigarette manufacturers, when sued, denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

150.    Cigarette manufacturers claimed attorney-client privilege to shield as many documents as possible from disclosure and destroyed and/or refused to produce documents related to health issues and Plaintiff's claims.

151.    Cigarette manufacturers, when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimant for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

152.    The acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and its co-conspirators were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

153.    The aforementioned acts, false statements and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators for the purposes of inducing Plaintiff and others similarly situated to rely on such false statements and/or misrepresentations to induce persons such as Plaintiff to smoke, fail to quit or reduce consumption.

154.    Defendants knew that Plaintiff, as well as other customers, did not hold sufficient information to understand or appreciate the dangers of the cigarettes that she smoked.

155. Plaintiff, during the course of her smoking history, heard some or all of the false or misleading statements and/or similar statements made directly or indirectly by the Defendants, including advertisements and other marketing materials falsely representing or suggesting that cigarettes were not as dangerous from a health standpoint than they actually are, that there was no link between cigarettes and various types of lung diseases such as lung cancer and COPD, that cigarettes was not addictive, and that light cigarettes were safer and less hazardous than other cigarettes.

156. Believing and relying upon these false and misleading statements made by the cigarette manufacturers in its direct advertisements to consumers and by the manufacturers and its co-conspirators in interviews, testimony and publications, Plaintiff did not recognize the significant health risk posed by cigarettes not limited to but including the risk of developing lung cancer.

157. In further reliance upon the false and misleading statements made by the cigarette manufacturers in its direct advertisements to consumers and by the manufacturers and its co-conspirators in interviews, testimony and publications, Plaintiff switched to filtered cigarettes, believing them to reduce any potential health risk connected to cigarette smoking.

158. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers either directly or indirectly, including Defendants herein, were justifiably relied upon by Plaintiff, resulting in her being unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of Defendants' cigarette products. Such acts, false statements and/or misrepresentations were made by the Defendant who had knowledge superior to Plaintiff regarding the health aspects of cigarettes including their addictive nature.

51

159. Had Defendants not made the aforementioned false statements and/or misrepresentations about the dangers of its cigarette products to Plaintiff and the public, Plaintiff would have stopped smoking at an earlier age and/or reduced the number of cigarettes that she consumed, and her risk of injury from cigarettes, including metastatic lung cancer, would have been reduced or eliminated.

160. As a direct and proximate result of the aforementioned acts, false statements and/or fraudulent misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, Plaintiff continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused her to develop injuries, including but not limited to metastatic lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff prays for judgment against Defendants R.J. REYNOLDS TOBACCO CO. and PHILIP MORRIS USA INC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus pre-judgment and post-judgment interest and costs of suit.

## COUNT VII: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION
### (All Manufacturers)

This count applies only to the following Defendants: R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP LLC.

161. The allegations in paragraphs 131 through 160 are realleged and reincorporated as if fully set forth herein.

162. The Defendants, along with other cigarette manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), unlawfully agreed to commit, and did commit, overt acts, false statements and/or fraudulent misrepresentations concerning information regarding the health effects

52

of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

163. During its four decade history the TIRC/CTR never acknowledged that smoking had been proven to be a cause of cancer or other serious diseases in smokers while maintaining publicly that smoking had not been proven to cause disease, even though the vast majority of CTR funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often, fatal diseases.

164. The acts, false statements and/or fraudulent misrepresentations described in the preceding paragraphs were material information.

165. Plaintiff relied to her detriment upon the acts, false statements and/or fraudulent misrepresentations of such information. Plaintiff, during the course of her smoking history heard, some or all the false or misleading statements and/or similar statements made directly or indirectly by the Defendants and their co-conspirators, believed some or all of the Defendants' and their co-conspirators false or misleading statements and relied to her detriment and continued to smoke cigarettes based on such false or misleading statements.

166. Had Defendants not made the aforementioned false statements and fraudulent misrepresentations of such information to Plaintiff, she would have reduced the number of cigarettes that she consumed and/or stopped smoking at an earlier age, and her risk of injury from cigarettes, including lung cancer would have been reduced or eliminated.

167. Each Defendants' acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and all of them, constitute a successful conspiracy to commit fraudulent misrepresentation.

168. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as a member of a civil conspiracy is liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

169. As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statements and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendants and their co-conspirators, Plaintiff continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused her to develop injuries, including but not limited to metastatic lung cancer in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

   **WHEREFORE**, Plaintiff prays for judgment against Defendants R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP LLC, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus pre-judgment and post-judgment interest and costs of suit.

54

FILED DATE: 6/30/2026 5:17 PM   2026L007750

**COUNT VIII: NEGLIGENCE (Distributor/Retailer)**

This count applies only to Defendant WALGREEN CO.

170. The allegations of paragraphs 1 through 54 are reincorporated and realleged as if fully set forth herein.

171. At all relevant times Plaintiff was a smoker who purchased and consumed cigarettes from Defendant WALGREEN CO.

172. At all relevant times, Defendant WALGREEN CO. knew or should have known that Plaintiff, as a member of the public for whose use cigarettes were placed into commerce, would be likely to use cigarettes in the manner described in this Complaint.

173. At all relevant times, Defendant WALGREEN CO. knew or had reason to know of the dangers associated with the manner and circumstances of Plaintiff's foreseeable use of cigarettes.

174. Tobacco products, such as cigarettes smoked and or consumed by Plaintiff, are not an ordinary or innocuous product.

175. Cigarettes are dangerous and well recognized to cause the death of fifty percent of consumers who smoke them.

176. There is no other product in Defendant WALGREEN CO.'s inventory that is more dangerous or kills more consumers than cigarettes. Defendant WALGREEN CO. had a broad range of knowledge about the components of cigarette smoke and how those components were unreasonably dangerous to its consumers, including that the components of cigarettes smoke contain carcinogenic, toxic and dangerous compounds.

177. At all relevant times, Defendant WALGREEN CO. had knowledge of the defective and unreasonably dangerous nature of the cigarettes it sells to its consumers that far exceeded

55

FILED DATE: 6/30/2026 5:17 PM    2026L007750

the knowledge or awareness of the health risks of smoking known by reasonable consumers, including Plaintiff.

178. At all relevant times, Defendant WALGREEN CO. knew or should have known that reasonable consumers, including Plaintiff, did not have the knowledge about how cigarettes were defective that was possessed by Defendant Walgreens.

179. Defendant WALGREEN CO. only recently began disclosing its superior knowledge to the public, long after Plaintiff had already been exposed to the defective and unreasonably dangerous cigarettes sold by Defendant WALGREEN CO.

180. For example, Defendant WALGREEN CO.'s own website now details particular, specific and scientific evidence of the dangerous components of the smoke from the cigarettes they sold.



*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018). WALGREEN CO. now acknowledges that there are 7,000 chemicals in every puff of cigarette smoke from the cigarettes it sells to its

consumers. These carcinogenic, toxic and dangerous components in cigarette smoke are not generally known by the reasonable consumer.

a. Acetone
b. Arsenic
c. Butane
d. Cadmium
e. Ammonia
f. Toluene and
g. Formaldehyde

181. Plaintiff and other reasonable consumers would not have knowledge of these dangerous chemicals in cigarettes.

182. Defendant WALGREEN CO. acknowledges in its website that its knowledge is superior to that of its consumers, and candidly admits that particular harms from smoking are not well known or recognized by its consumers. Defendant WALGREEN CO.'s website states **"Smoking affects you in more ways <u>than you know</u>…"**:



57

FILED DATE: 6/30/2026 5:17 PM   2026L007750

*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018).

183. Defendant WALGREEN CO.'s website cites to many diseases not generally known to be caused by smoking cigarettes, including "[i]ncreased risk of cataracts and macular degeneration, which could lead to blindness…[r]isks of stroke, heart disease…[i]ncreased risk of erectile dysfunction and damaged/decreased sperm, which can lead to infertility or genetic defects in offspring." *Id.*

184. Defendant WALGREEN CO.'s superior knowledge about the inherent dangers and defects of cigarettes arose in part from its close relationship with the tobacco industry. Defendant WALGREEN CO. was aware as of 1977 at the latest that the tobacco industry including the co-defendant cigarette manufacturers, had engaged in creating a "controversy" to dispute the harmful effects of tobacco products.

185. Defendant WALGREEN CO. was actively engaged with the tobacco industry and the industry's co-conspirator, the Tobacco Institute, as shown by correspondence between Defendant WALGREEN CO. and tobacco industry executives.

186. For example, Defendant WALGREEN CO. reached out to the tobacco industry in March 1977 to declare what one tobacco executive described as its "willingness to take part in the smoking and health controversy on the side of the tobacco industry." *See* Letter from J. Kendrick Wells, III to Horace R. Kornegay dated March 29, 1977, Bates Number 687020794.[2]

---

[2] Documents referenced by Bates Numbers can be accessed through UCSF Library and Center for Knowledge Management tobacco document archive located at https://www.industrydocumentslibrary.ucsf.edu/tobacco/.

187.    Defendant WALGREEN CO.'s Manager of News and Information Services, David C. Carlson, wrote to the president of the Tobacco Institute, Horace R. Kornegay, to explore possibilities of using its role as a "health center" to gain support for the tobacco industry:

> As you know, we at Walgreens are exploring the possibilities of an information program which will help both the tobacco Industry and ourselves. We don't want to step into the middle of a raging controversy, but as an established "health center" there are many, many things we can do to 'gain and maintain the understanding and support of the public."

*See* Letter from David C. Carlson to Horace R. Kornegay, dated March 16, 1977, Bates Number TIMN0083432.

188.    Defendant WALGREEN CO. had a "real interest in being of every possible assistance" to the tobacco industry "in getting the true word put about." *See* Memorandum dated March 17, 1977, Bates Number TIMN0083434.

189.    As further example of its close relationship with the tobacco industry and its involvement in selling what it knew to be defective and unreasonably dangerous cigarettes to the public, including Plaintiff, when Defendant WALGREEN CO. became aware in 1993 of litigation involving the tobacco industry's defective cigarette products, it sought indemnification from each of the major cigarette manufacturers for future lawsuits against it. *See* Letter from David L. Grobart to Jackie Gilbert, dated June 2, 1993, Bates Number 2064877537.

190.    Additionally, Defendant WALGREEN CO. was told directly by R.J. Reynolds personnel in 2008 that "[n]o tobacco product has been shown to be safe and without risks" and "[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals and is in the best interest of consumers, manufacturers and society". *See* RJRT Presentation, Bates Number 557062850.

59

191. These and other contacts that Defendant WALGREEN CO. had with the tobacco industry, including the cigarette manufacturers, show that Defendant WALGREEN CO. was aware of the defective and unreasonably dangerous nature of cigarettes, and that its knowledge was superior to the knowledge of the public, including Plaintiff.

192. Indeed, Defendant WALGREEN CO. knew as early as the 1990s that its co-defendants manufactured less hazardous cigarette products, like denicotinized cigarettes, low nicotine cigarettes, and non-combustible cigarette products.

193. Defendant WALGREEN CO. chooses to continue selling defective cigarettes to the public despite industry standards and norms set by other national retailers, such as Target and CVS, and most independent pharmacies and drugstores which have ceased cigarette sales.

194. Tobacco sales in pharmacies directly contradict the pharmacist's code of ethics, which states that pharmacists must be committed to the welfare of their patients and must act with honesty and integrity in professional relationships, avoid actions that compromise dedication to the best interests of their patients. *See* American Pharmacists Association Code of Ethics https://www.pharmacist.com/code-ethics (last accessed on November 1, 2018).Since 1971, the American Pharmaceutical Association position has recommended against the display and sale of cigarettes in pharmacies, which is in direct contradiction to the role of the pharmacy as a public health facility.

195. Defendant WALGREEN CO. is aware that smoking is the leading cause of death in the United States but chooses to ignore statistics to profit from the sale of defective cigarettes.

196. Defendant WALGREEN CO. continues to sell defective cigarettes to consumers like Plaintiff to profit further on smoking cessation devices, such as nicotine replacement

60

patches, gum and lozenges, as well as prescription nicotine replacement therapies, such as varenicline and bupropion.

197. At all relevant times, Defendant WALGREEN CO. had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product which it knew or should have known was unreasonably dangerous and defective when put to the use for which it was designed, manufactured, distributed, marketed, and sold and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others when it knew or should have known that consumers and other users lacked such knowledge about the defects or dangerous conditions of the product.

198. In breach of this duty, Defendant WALGREEN CO. sold and continued to sell cigarettes to Plaintiff and the public which it knew were defective and unreasonably dangerous.

199. Had Defendant WALGREEN CO. not sold to Plaintiff cigarette products that it knew were defective and unreasonably dangerous, Plaintiff would have smoked less cigarettes and/or stopped smoking at an earlier age, and her risk of injury from cigarettes would have been reduced or eliminated.

200. As a direct and proximate result of the aforementioned negligent acts and/or omissions of the Defendants, Plaintiff developed injuries, including but not limited to metastatic lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff prays for judgment against Defendant WALGREEN CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

61

FILED DATE: 6/30/2026 5:17 PM   2026L007750

## COUNT IX: STRICT LIABILITY (Distributor/Retailer)

This count applies only to Defendant WALGREEN CO.

201.     The allegations contained in paragraphs 1 through 54 are reincorporated and realleged as if fully set forth herein.

202.     The Defendant, WALGREEN CO. owed a duty to Plaintiff and the public to sell only products which were reasonably safe for their intended use, and to refrain from selling any product which was unreasonably dangerous, and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others.

203.     The Defendant WALGREEN CO. breached said duty by placing into the stream of commerce, distributing, marketing, promoting and selling cigarette products that at the time the tobacco products left the possession of Defendant WALGREEN CO., and at the time the tobacco products entered into the stream of commerce, were in an unreasonably dangerous and defective condition.  These defects, of which Defendant WALGREEN CO. had actual knowledge, include but are not limited to:

   a.   the tobacco products contained tar that is deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

   b.   the tobacco products contained tar that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

   c.   the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and made it unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

   d.   the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

62

FILED DATE: 6/30/2026 5:17 PM    2026L007750

e.   the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

f.   the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

g.   the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

h.   the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

i.   through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and made the tobacco product unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

j.   through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

k.   the nature and degree of the danger of Defendant's cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

l.   the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco product;

63

FILED DATE: 6/30/2026 5:17 PM   2026L007750

m.  the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe that when put to a use that is reasonably foreseeable, posing dangers that go beyond that of which an ordinary consumer would expect;

n.  the tobacco products were in an unreasonably dangerous condition and not suitable for the uses intended and were defective;

o.  the tobacco products failed to perform as safely as an ordinary consumer would expect when used in the manner reasonably foreseeable by the Defendant WALGREEN CO.; and/or

p.  the risk of danger of the tobacco products outweighed the benefits.

204.  As a direct and proximate result of the aforementioned defects described herein, Plaintiff developed injuries caused by the consumption of cigarette products purchased from Defendant WALGREEN CO., including but not limited to metastatic lung cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff prays for judgment against Defendant WALGREEN CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus pre-judgment and post-judgment interest and costs of suit.

### JURY DEMAND

Plaintiff respectfully requests the Court for a trial by jury.

Dated: June 30, 2026                         Respectfully submitted,

                                             KATHLEEN HAMAKER

                                             MEYERS & FLOWERS, LLC


                                             */s/ Peter J. Flowers*
                                             Peter J. Flowers, One of its Attorneys

Peter J. Flowers, Esq.
Craig D. Brown, Esq.
Jonathan P. Mincieli, Esq.

64

MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois   60174
Tel: (630) 232-6333
Fax: (630) 845-8982
pjf@meyers-flowers.com
cdb@meyers-flowers.com
jpm@meyers-flowers.com

Chicago Office:
225 W. Wacker, Suite 1515
Chicago, IL  60606

AND

Andi M. Hernandez, Esq.
THE ALVAREZ LAW FIRM
3251 Ponce de Leon Blvd.
Coral Gables, FL 33134
Tel: (305) 444-7675
Fax: (315) 444-0075
Andi@tobacco@integrityforjustice.com
Tobacco@integrityforjustice.com

65